IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JULIE BOUMEHDI, | ) |
| Plaintiff, | ) ) ) ) ) |
| v. | ) Case No. 04 C 672 |
| PLASTAG HOLDINGS, LLC., | ) HONORABLE CHARLES R. NORGLE ) ) |
| Defendant. | ) |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, Defendant's Motion for Summary Judgment is granted.

### I. BACKGROUND[1]

**A. Facts**

This case arises out of alleged sexual harassment Plaintiff Julie Boumehdi ("Boumehdi") suffered while employed at Defendant Plastag Holding, LLC ("Plastag"). Boumehdi started working at Plastag in 1995 as a Silk Screen Pressman. At the time, she earned $8.00 an hour, based on a 40 hour work week.

In December 1998, Boumehdi applied for a position as a Press Feeder in the Lithographic

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

printing department. Her application was approved in January 1999. As part of her new position, Boumehdi received a raise from $13.50 to $14.21 per hour. Employees who work in the Lithograph department are paid higher than those in the Silk Screen division, because the lithograph printing process is considered more complex. At the time Boumehdi transferred, three employees worked as Feeders (also known as Press Assistants). Among the co-workers, Robert Barsale ("Barsale") served as a Feeder in Plastag's Lithograph department since 1998. He had 29 years of lithographic printing experience, and had worked on one, two, four, and five-color lithographic presses throughout his career.

Additionally, Jose Vega ("Jose") had worked as a Feeder at Plastag's lithographic department from 1997 until the present day. Jose had been a Press Helper, a Feeder, or a Second Pressman for 16 years, and had supported four, five, and six-color presses for the last 10 years.

Plastag alleges that it followed a comprehensive set of written rules for conducting employee performance evaluations, and for the determination of wage increases for its employees. Plastag further claims that in order to determine an employee's wage increase, it performed a mathematical calculation that considers the employee's prior hourly wage, overall performance evaluation, and an established merit increase grid applied to all employees equally. According to Plastag, this system had been in place since 1999, and was in place throughout Boumehdi's performance reviews until her resignation. Boumehdi, however, disagrees with this claim, and alleges that this mathematical calculation was not applied to all employees.

In January 2002, Boumehdi received her second-to-last performance evaluation. Boumehdi's supervisor, Ed Vega ("Vega"), conducted the review. He gave Boumehdi an overall review rating of 1.75 on a scale of 1 to 4. A "1" rating indicates that the employee "frequently

exceeded expectations throughout the review period," while a "4" rating indicates that the employee "failed to meet minimum expectations" and that the employee needs improvement in order to retain his or her position. As a result of her January 2002 evaluation, Boumehdi received a pay increase from $17.50 per hour to $18.07 per hour.

Boumehdi alleges that beginning in the late summer of 2002 and until she quit in July 2003, Vega harassed her. According to Boumehdi, Vega made her life a "living hell." Specifically, Boumehdi alleges that Vega told her that women do not belong in the pressroom, and that women think they know everything. By her calculations, Boumehdi claims that Vega made this comment at least five times and "very often." In the winter of 2002, Boumehdi had bent over during the course of her work. Vega told her to remain in that position and that it was "perfect." On more than one occasion, Boumehdi claims that Vega said that she should wear more low cut blouses and shorter shorts.

Moreover, Boumehdi claims that Vega asked her if she got breast enlargements over the weekend while Boumehdi was pregnant. In December 2002, January 2003, and April 2003, Vega told Boumehdi to clean the press room because that is what "women are supposed to do." Then, in the late summer 2002 and winter 2003, Vega would say that he had to get out of "here" because he had to "get a lap dance." Boumehdi claims that this occurred on at least a "couple" of occasions.

Boumehdi waited until February 2003 to meet with Michael Bell ("Bell"), Plastag's Director of Human Resources. In these meetings, Boumehdi informed Bell about certain medical issues, job stagnation, career development, and concerns about Vega. Boumehdi, however, claims that the purpose of these meetings was only to complain about Vega, and her pay. Plastag

3

further claims that at these meetings, Boumehdi said that she was tired of the grind, and that she would probably quit her job. Lastly, Boumehdi alleged that she was not paid for hours she felt she deserved, and that this was a result of Vega not approving her timecard.

Then, in March 2003, Boumehdi received her next evaluation. This time, her overall review rating was a 2.75. A "2" rating indicates that the employee "fully met expectations throughout the review period." The evaluation further indicated that, in respect to Boumehdi's work, she needed improvement, and that she needed to focus on loading and cleaning the press. According to Plastag, Boumehdi received low ratings in the area of her dependability, and her cooperation with other employees. Boumehdi did not receive a pay increase after this evaluation, because Plastag claims that it does not provide raises to employees with overall ratings of 2.5 or greater. Boumehdi denies the truth of the statements made in the evaluation.

Pursuant to his conversations with Boumehdi, Bell spoke with Vega. Vega informed him that Boumehdi was "never at her work station," was "constantly disappearing," and that her work was "sloppy." After talking with Vega, Bell determined that Boumehdi had punched in early and did not work, took long breaks, and did not punch out at the end of her shift, and left early. Boumehdi, however, denies that any investigation was conducted, and this was only a cover up investigation, done after both Vega and Boumehdi had left Plastag.

On July 7, 2003, Boumehdi left a note in Bell's inbox which read that her "work environment had become intolerable." Then, on July 10, 2003, Boumehdi resigned from Plastag. Soon after Boumehdi resigned, Bell conducted his investigation as to her claims. Plastag's investigation concluded that Boumehdi's supervisor, Vega, had changed the rules of operation often for all employees, male and female, depending on the needs of the Lithograph department.

4

Additionally, on July 24, 2003, Bell mailed a letter to Boumehdi's home stating that he wanted to speak with her about any of the issues she raised upon her resignation. Bell claims that Boumehdi never responded; however, Boumehdi alleges that she called Bell and left a voice message for him.

Then, on August 5, 2003, Boumehdi filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

## B. Procedural History

On January 28, 2004, Boumehdi filed her initial complaint, alleging sexual discrimination and retaliation, pursuant to Title VII, 42 U.S.C. § 2000e-3, and violations of the Equal Pay Act, 29 U.S.C. § 206, et seq. Then, on July 6, 2004, Boumehdi filed her Amended Complaint. On March 27, 2006, Plastag filed its Motion for Summary Judgment. On June 30, 2006, Boumehdi filed her Response, and Plastag Replied on August 4, 2006. Plastag's Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

## A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

**B. Title VII- 42 U.S.C. § 2000e**

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges

6

of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see Whittaker v. Northern Illinois University, 424 F.3d 640, 645 (7th Cir. 2005). In order to prevail under on a gender discrimination claim under Title VII, Boumehdi must "either show direct evidence of discriminatory motive or intent, or rely on the indirect burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Bio v. Federal Express Corp., 424 F.3d 593, 596 (7th Cir. 2005).

Under the McDonnell Douglas method, a female plaintiff who alleges gender discrimination must establish four elements: (1) that she is a member of a protected class; (2) that she is performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that she was treated less favorably than at least one male colleague. Farrell v. Butler Univ., 421 F.3d 609, 613 (7th Cir. 2005) (citing Lim v. Trus. of Ind. Univ., 297 F.3d 575, 580 (7th Cir. 2002)).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the decision. Id. If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. Id. To establish pretext, the plaintiff may show that the reasons given by the employer are factually baseless, were not the actual motivation for the decision, or were insufficient to motivate the decision. Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000). The failure to establish any one of the initial four elements defeats a plaintiff's discrimination claim. Id. With these principles in mind, we turn to Plastag's Motion for Summary Judgment.

7

### C. Boumehdi's Title VII Discrimination Claim

#### *1. Actual Service is Required*

Plastag argues that because the EEOC issued its first Right to Sue letter on October 24, 2003, and that Boumehdi did not file her Complaint until January 17, 2004, that her claims are untimely under the 90-day rule. Specifically, Plastag argues that the first EEOC letter was sent to Boumehdi's address, and was unclaimed, and returned to sender. After the EEOC received the unclaimed letter, it forwarded this notice to Boumehdi, noting that the letter was unclaimed. Boumehdi finally received the second letter, along with the original notice, on December 19, 2003. Therefore, Plastag argues, because Boumehdi filed her initial complaint more than 90 days after she received the EEOC's Right to Sue letter of October 24, 2003, her case is untimely.

However, actual notice, not constructive notice is required to start the 90 day rule, and Boumehdi did not receive any actual notice until December 19, 2003, when she physically received the EEOC's Right to Sue letter. A plaintiff in a Title VII case "must file her suit within 90 days from the date the EEOC 'gives notice' of her right to sue." Bobbitt v. Freeman Co., 268 F.3d 535, 538 (7th Cir. 2001). Usually, the 90-day period "commences when the plaintiff receives actual notice of her right to sue." Id. (citing Houstons v. Sidley & Austin, 185 F.3d 837, 838-39 (7th Cir. 1999)). When a plaintiff does not receive actual notice in a timely fashion, "due to her own fault, the actual notice rule does not apply." Id. (citing St. Louis v. Alverno Coll., 744 F.2d 1314, 1316-17 (7th Cir. 1984)). An example of such delay occurs when a plaintiff "fails to notify the EEOC of a change of address." Id.

In this case, the court finds that Boumehdi's failure to receive the October 24, 2003 Right to Sue Letter from the EEOC was not due to her own fault. There is nothing in the record to

8

suggest that Boumehdi deliberately refused to accept the EEOC's certified letter, or that she had changed her address without notifying the EEOC. As a result, the 90 day filing period began to run on December 19, 2003, and the Complaint filed on January 28, 2004 is therefore timely.

### *2. Boumehdi has not established a prima facie case of sexual discrimination*

Boumehdi does not submit any direct evidence to create a factual dispute as to whether she was discriminated based on her gender. Direct evidence is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 n.6 (7th Cir. 1997). Direct evidence "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994). Boumehdi submits no direct evidence in the form of admissions, documents or other materials that shows Plastag's intent to discriminate against her because she is a female. As a result, the court must therefore proceed under the McDonnell Douglas burden shifting analysis.

As an initial matter, the court finds that Boumehdi has not established a prima facie case of gender discrimination under Title VII. Boumehdi, a woman, is a member of a protected class. The record also demonstrates that she had performed her job satisfactorily until she left Plastag in July 2003. However, it is under the third and fourth element of the prima facie test that Boumehdi encounters problems.

### *a. Hostile Work Environment*

Under the third prong, Boumehdi must show that she suffered an "adverse employment action." See Farrell, 421 F.3d at 613-14. Boumehdi was not terminated from her position at Plastag. She "quit on July 10, 2006." Pl.'s Stmt. of Mat. Facts, ¶ 146. Boumehdi further alleges that she was constructively discharged from her position, because Vega created a hostile work environment.

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted this statute to prohibit employers from forcing employees to "work in a discriminatory hostile or abusive environment." Shanoff v. Ill. Dept. of Human Serv., 258 F.3d 696, 701 (7th Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Workplace discrimination in the form of "'intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates Title VII. Harris, 510 U.S. at 21 (citations omitted) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000). "By its terms, this provision of Title VII proscribes only workplace discrimination . . . it is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct." Berry v. Delta Airlines, Inc., 260 F.3d 803, 808 (7th Cir. 2001).

To survive summary judgment on a hostile work environment claim, a plaintiff is "required to establish that: (1) he was subjected to unwelcome harassment, (2) the harassment

was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." Beamon v. Marshall & Ilsley Trust Co., 411 F.3d 854, 863 (7th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004)). "A plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive." Ezell v. Potter, 400 F.3d 1041, 1047 (7th Cir. 2005) (citing Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003)). "A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all the circumstances." Id.

Factors relevant to determine whether the workplace is objectively offensive include: "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Moser v. Indiana Dept. of Corrections, 406 F.3d 895, 902 (7th Cir. 2005) (quoting Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993)). The workplace is "subjectively hostile when the worker actually perceives it as such." Ezell, 400 F.3d at 1048 (citing Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000)). "The workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).

The court notes that "[O]ne very severe act of harassment might create a hostile environment, but that would be the rare case." Patton v.Keystone RV Co., 455 F.3d 812, 815 (7th Cir. 2006) (quoting Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000)). Typically "it is a combination of severity and frequency that reaches the level of actionable harassment." Patton, 455 F.3d at 816.

11

Here, the conduct Boumehdi describes can at best be characterized as boorish, pigish, and insensitive. However, Vega's behavior does not rise to the level of "unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004). Specifically, Boumehdi claims that Vega made at least 18 comments over the course of 9 months, from the Fall 2002 through July 2003. These comments include Vega's statements that "women don't belong in the pressroom," "women think they know everything," and that "women are supposed to do the cleaning." Additionally, Boumehdi alleges that Vega told her that she "should wear shorter shorts and low cut blouses, as other female employees," and that Vega asked her "whether she had received breast implants over the weekend."

Furthermore, Boumehdi alleges that when she was bending down during the course of her work, Vegas exclaimed that she should "remain in that position" and that "it was perfect." Lastly, Boumehdi claims that Vega would shout out to any and all in the vicinity that he had to "get out of here to get a lap dance." Boumehdi does not state who else heard this statement, or who was present when Vega shouted this out in the office.

As a result, the court finds that such intermittent conduct, over the course of less than a year, cannot be classified as either objectively or subjectively "severe" or pervasive" as to create a hostile work environment. See Patton, 455 F.3d at 812; see also Baskerville v Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (defendant employer who said that all the "pretty girls should run around naked" did not create hostile work environment to female plaintiff). In fact, Boumehdi states that she did not believe she was being harassed until March or April 2003. See

Pl.'s Stmt. of Mat. Facts, ¶ 100. Therefore, because Boumehdi cannot establish the request elements of a hostile work environment, her claim is doomed. See Hilt-Dyson, 282 F.3d at 463.

### b. Similarly Situated Employees

Boumehdi's Title VII claim also fails because she cannot satisfy the similarly situated prong of the McDonnell Douglas test. A similarly situated employee "is one who is 'directly comparable to the plaintiff in all material aspects.'" Bio, 424 F.3d at 596 (quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)); see Walker, 410 F.3d at 396 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). To determine whether two employees are similarly situated, the court must "look at all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications– provided the employer considered these latter factors in making the personnel decision.'" Bio, 424 F.3d at 596 (quoting Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)).

None of Plastag's employees are similarly situated to Boumehdi. Boumehdi states that Mike Hezinger ("Hezinger") received a higher wage than Boumedhi, yet Boumehdi felt she was more qualified. However, Boumehdi admits that Hezinger had six months seniority on her in the Lithograph department. Jose Vega, another of Boumehdi's co-workers had worked on four, five, and six-color presses, and had prior experience as a Press Helper or Second Pressman for sixteen years. Boumehdi, on the other hand, worked for two years as an operator on three-color flexographic press, and worked for three years as an operator on a lithgraphic press at other

13

companies. Based on this evidence, the court finds that Boumehdi is not similarly situated to other employees, who had different lithographic working experience.

### 2. Legitimate Reason for Termination

Even though Boumehdi has not established a prima facie case for discrimination under Title VII, with an abundance of caution, the court will proceed with the remaining McDonnell Douglas analysis. Assuming, arguendo, that Boumehd has established a prima facie case of discrimination, the burden shifts back to Plastag to establish a legitimate, non-discriminatory reason for Forrester's termination. See Ballance, 424 F.3d at 617. The difficulty in this element of the McDonnell Douglas analysis is that Plastag did not fire Boumehdi. She voluntarily resigned her position. Because the court has previously found that Boumehdi was not constructively discharged, and that no hostile work environment existed at Plastag, this prong of the analysis is not required.

### 3. Pretext Argument

Lastly, after Plastag has established its legitimate reason for termination, the burden shifts back to Boumehdi to show that the proffered reason is pretextual. See Stewart, 207 F.3d at 376; see also Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004). Here, because Plastag never fired Boumehdi, it could not have offered any reasons for such an action that Boumehdi could deem pretextual. Therefore, the court cannot engage in a meaningful analysis of this final prong of the indirect burden-shifting analysis.

As a result, the court finds that Boumehdi has not created a genuine issue of material fact as to whether Vega sexual discriminated against her on the basis of her sex. Therefore, summary judgment is granted to Plastag on the Title VII discrimination claim.

## D. Boumehdi's Retaliation Claim

Next, Boumehdi alleges that Plastag "discharged Plaintiff . . . for openly opposing the sex discrimination by the Defendant." Am. Compl., ¶¶ 23, 24. Title VII "makes it unlawful 'for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by [Title VII].'" Tomanovich v. City of Indianapolis, 457 F.3d 656, 662-63 (7th Cir. 2006). A plaintiff may "prove retaliation by using either the direct method or the indirect, burden-shifting method." Id. (quoting Moser v. Ind. Dept. of Corr., 406 F.3d 895, 903 (7th Cir. 2005)). Under the direct method, "a plaintiff must show that '(1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two.'" Id. In order to prove retaliation under the indirect method, "the plaintiff must establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similiary situated employees who did not engage in statutorily protected activity." Id. (quoting Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998)).

If the plaintiff is able to establish a prima facie case, "the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action." Adusumilli, 164 F.3d at 362. Then, "if the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual." Tomanovich, 457 F.3d at 663.

15

## 1. *Direct Method*

Boumehdi's Retaliation Claim fails under the direct method because she cannot establish that she suffered an adverse employment action, or that similarly situated employees were treated less favorably. First, Boumehdi does not describe what the specific "statutorily protected activity" she partook in. Boumehdi merely states that she was terminated for her open opposition to Vega's actions, which she viewed as sexual harassment. Furthermore, Boumehdi cannot show that she "suffered an adverse action taken by the employer." Id. Boumehdi alleges that she was constructively discharged, not that Plastag fired her as a result of any her actions.

In its memorandum, Plastag does not address each element of the direct method's prima facie case. Instead it focuses on whether Boumehdi was constructively discharged from her position. The Seventh Circuit has held that "the working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." Patton, 455 F.3d at 818 (quoting McPherson v. City of Waukegan, 379 F.3d 430, 434 (7th Cir. 2004)). In order to maintain a claim of constructive discharge, Boumehdi must show that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign." Id. (quoting Pa. State. Police v. Suders, 542 U.S. 129, 147 (2004)).

A "credible death threat that signals grave danger to the plaintiff's bodily integrity . . . can constitute grounds for finding constructive discharge." Tutman v. WBBM-TV, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000). Boumehdi's case, however, does rise to this level. Boumehdi has submitted no evidence that a reasonable person would find her work environment so intolerable, that the only decision she could make would be to quit. At most, Vega's alleged statements are

16

stray remarks, insensitive, and lack a general sense of decency. However, "Title VII is not a general civility code." Patton, 455 F.3d at 815. No reasonable employee would find that the comments Vega made would create a workplace so intolerable, that continued employed would be rendered impossible. As a result, Boumehdi's retaliation claim must fail.

Moreover, the analysis on the second and third parts of the burden-shifting method in Boumehdi's retaliation claim are identical to the analysis undertook in her sexual discrimination claim. Because Plastag did not terminate Boumehdi's employment with the company, it does not have to establish a legitimate, non-discriminatory reason for personnel action it never undertook. Therefore, Boumehdi is not required to show that Plastag's reasons are pretextual.

### 2. *Indirect Method*

Just as in the direct method analysis, Boumehdi is unable to show that she had engaged in any specific type of protected activity, that she suffered an adverse employment action, or that similarly situated employees were treated more favorably than her. The court has previously engaged in an thorough analysis of the similarly situated prong of this test, and therefore does not repeat the same analysis.

### 3. *Remainder of Burden-Shifting Method*

As in Boumehdi's Title VII sexual discrimination claim, the court has already engaged in a thorough analysis of the burden shifting method, and relies on its findings in Section II C of this Opinion.

### E. Boumehdi's Equal Pay Act Claim

Boumehdi also alleges that Plastag violated the Equal Pay Act ("EPA") by "paying male employees, who performed essentially the similar duties, had equal levels of skill, effort and responsibility . . . a higher wage rate than that of Plaintiff . . . because she is a female." Am. Compl., ¶ 19.

In order to establish a "prima facie case of wage discrimination under the EPA, a [plaintiff] must show: (1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." Cullen v. Ind. Univ. Bd. of Trustees, 338 F.3d 693, 698 (7th Cir. 2003) (quoting Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998)).

In order to determine "whether two jobs are equal, the crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion the two jobs is identical.'" Cullen, 338 F.3d at 698 (quoting Fallon v. Ill., 882 F.3d 1206, 1209 (7th Cir. 1989)). Once the plaintiff "establishes a common core, the court must ask whether any additional tasks make the jobs 'substantially different.'" Id. The court notes that "the EPA does not require proof of discriminatory intent." Id. (citing Stopka, 141 F.3d at 685).

Here, it is undisputed that Boumehdi satisfies the first prong of the test. In 2002 and 2003, Boumehdi earned $18.07 an hour, while Mike Hezinger ("Hezinger"), her collegue, earned $20.00 per hour. Hezinger had worked as a Press Feeder, six month before Boumehdi received her promotion. Pl.'s Stmt. of Mat. Facts, ¶ 129. During this time, both Hezinger and Boumehdi worked as Press Feeders, and Boumehdi was the only female in the department.

18

Furthermore, it is undisputed that Boumehdi has satisfied the second and third prongs of a prima facie EPA claim. Hezinger and Boumehdi did the same type of work as Press Feeder, and in the same working conditions. Vega described Hezinger's and Boumehdi's tasks as being "the same job." Pl.'s Stmt. of Mat. Facts, ¶ 31.

Because Boumehdi has established a prima facie case, the burden of persuasion shifts back to [Plastag] to show that the difference in pay was justified by one of four ways permitted by statute: (1) a seniority system; (2) a merit system: (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. See Cullen, 338 F.3d at 702; see 29 U.S.C. § 206(d)(1).

Plastag incorporates three of the four affirmative defenses, and argues that the disparity in pay between Boumehdi and Herzinger was due to a combination of "experience, skill level, and seniority." Def.'s Mem. in support of Summ. J., at 18. According to Plastag, it took into account factors such as level of experience with the press feeder, her departmental seniority, prior experience, and her prior evaluations while at Plastag. This was conducted under a comprehensive set of established, written rules that Plastag had in place since 1999. Through its evaluation process, Plastag found that each of the three other male Press Feeders surpassed Boumehdi in some, if not all, of these criteria. As a result, the male Feeders earned a higher wage than Boumehdi. Therefore, because Plastag has established an affirmative defense as to why Boumehdi received a lower hourly wage than her male co-workers, summary judgment is proper as to Plastag, on the EPA count.

## F. Successor Liability

Lastly, the court does not address the issue of successor liability, because Boumehdi has not established a genuine issue of material fact as to any of her substantive claims. Therefore, there is no basis to analyze the issue of successor liability.

## III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge

United States District Court

DATED: 10-20-06